[L.A. No. 31105. Dec. 14, 1979.]

GREATER WESTCHESTER HOMEOWNERS ASSOCIATION
et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

COUNSEL

Burt Pines, City Attorney, Lawrence M. Nagin, James H. Pearson, Assistant City Attorneys, and Kern & Wooley for Defendant and Appellant.

George Agnost, City Attorney (San Francisco), Donald J. Garibaldi, David I. Kroopnick, Louis E. Goebel, Michael Scott Gatzke, Ruth R. Mijuskovic, Luce, Forward, Hamilton & Scripps, Richard K. Simon and Kadison, Pfaelzer, Woodard, Quinn & Rossi as Amici Curiae on behalf of Defendant and Appellant.

Fadem, Berger & Norton and Michael M. Berger for Plaintiffs and Respondents.

**OPINION**

**RICHARDSON, J.**—Is a municipality which owns and operates an airport liable on a nuisance theory for personal injuries sustained by nearby residents and caused by noise from aircraft using the facility? We will conclude that it is. The resolution of this issue requires a careful weighing of two conflicting interests and policies. On the one hand, by ancient law, the owners and occupants of land are entitled to the peaceful use, possession, and enjoyment of their property. On the other, the general public has a strong interest in the transportation and related services furnished by commercial aviation. These two interests, the private and the public, are solidly founded in the common law and deeply rooted in established constitutional doctrine. When locked in confrontation, which interest prevails and under what circumstances?

We have looked at the problem before. (*Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582 [39 Cal.Rptr. 708, 394 P.2d 548].) We examine it again in reviewing a judgment entered in the Los Angeles Superior Court in 1976 following a 1975 trial wherein plaintiffs, multiple homeowners and their families living in the Westchester area adjacent to Los Angeles International Airport (LAX), sought damages from the defendant, City of Los Angeles (City), which owns and operates LAX. The condition of nuisance giving rise to their claim of emotional and mental distress was the noise generated by the arrival and departure of jet aircraft at LAX, the nation's third largest commercial aviation facility.

In 1968 plaintiffs, as owners and occupants of homes situate near LAX's two north runways, sued the City in inverse condemnation for property damage and, on a nuisance theory, for personal injuries allegedly caused by noise, smoke, and vibrations emanating from aircraft

using LAX. Plaintiffs' action was consolidated with other suits for direct condemnation which were brought by City against the owners of other nearby parcels of land. Trial of the direct condemnation and nuisance actions was bifurcated, and substantial direct and inverse condemnation judgments in favor of plaintiffs were entered and fully satisfied.

The nuisance phase of the case, tried before the court, resulted in findings of fact to the effect that the noise created by jet aircraft using the two north runways of LAX "interfered with person-to-person conversation in the home,...[with] normal telephonic communication, with the ability to enjoy the use of the out-of-doors' portion of their property and...to hear and enjoy television programs; that such noise caused frequent arousal from sleep and, in some cases, interfered with the ability...of school age members of the families to study in their homes." On the basis of the foregoing findings the trial court concluded that plaintiffs had established the existence of an actionable nuisance giving rise to damages for "annoyance, inconvenience, discomfort, mental distress, and emotional distress," and that a nuisance recovery was independent of plaintiffs' claim for diminution of their property values.

In the nuisance proceeding 41 plaintiffs were awarded damages in the aggregate sum of $86,000 for personal injuries sustained during the period 1967-1975. Thereafter, in a postjudgment order the trial court imposed prejudgment interest on all of the awards, both condemnation and nuisance, and also assessed $200,000 attorney's fees against City which appeals from both the nuisance judgments and the postjudgment order.

Either by way of stipulation or from undisputed evidence, the following significant facts were established: The federal government exercises exclusive control over aircraft "in flight," defined as all movement of the plane from departure to arrival gates; LAX operates in a residential zone under a 1955 conditional use permit from City; City initially located the two north runways with full knowledge that the noise from their use would reach nearby established residences; the north runways were constructed with substantial federal financial assistance under grant agreements between City and the Federal Aviation Administration (FAA); and all commercial aircraft using LAX have federal airworthiness certificates which indicate compliance with federal noise emission standards.

City has consistently argued that plaintiffs' nuisance claim must fail for two reasons. First, the noise in question originates from flying aircraft over which the United States government exercises exclusive dominion and therefore any attempted noise control by an airport operator is federally preempted. Second, the operation of aircraft being expressly sanctioned by statutory law, any aircraft noise emissions cannot constitute a nuisance because of Civil Code section 3482, which provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." We review, and will reject, each of these contentions and will also consider several collateral questions raised by the trial court's postjudgment order.

### Preemption

*Certain fundamental principles expressed by the United States Supreme Court guide our analysis of the preemption issue.* ■ When respective federal and state sovereignties are juxtaposed, "the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted.'" (*Merrill Lynch, Pierce, Fenner & Smith* v. *Ware* (1973) 414 U.S. 117, 127 [38 L.Ed.2d 348, 359, 94 S.Ct. 383].) The courts thereby attempt "the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce. . . ." (*Freeman* v. *Hewit* (1946) 329 U.S. 249, 253 [91 L.Ed. 265, 272, 67 S.Ct. 274].)

The United States Supreme Court has described, generally, the scope of the preemption doctrine. ■ It has said that federal regulation of an area of commerce may preempt state actions upon the same subject matter if (1) there is an apparent congressional intent to blanket the field, (2) the federal and state schemes directly conflict, or (3) any state intervention would burden or frustrate the full purposes and objectives of Congress. (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 141 [10 L.Ed.2d 248, 256, 83 S.Ct. 1210]; *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230-231 [91 L.Ed. 1447, 1459-1460, 67 S.Ct. 1146].) The controlling inquiry on the preemption issue is determining whether the state action stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 57, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399].)

■ The preemptive intent of Congress may be explicit or implicit, but where the effect of preemption is to impede the exercise of historic

state powers the high court has held that the intent must be "clear and manifest." (*Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 614, 97 S.Ct. 1305], quoting *Rice, supra,* at p. 230 [91 L.Ed. at p. 1459].) Furthermore, preemption exists only to the extent necessary to serve congressional objectives. (*Merrill Lynch, Pierce, Fenner & Smith* v. *Ware, supra,* 414 U.S. at p. 127 [38 L.Ed.2d at p. 359].) Additionally, it has long been recognized that state action may also be precluded where it unreasonably affects or discriminates against interstate commerce, or touches upon a field of commerce which requires uniform national regulation. (U.S. Const., art. I, § 8, cl. 3; *A&P Tea Co.* v. *Cottrell* (1976) 424 U.S. 366, 370-372 [47 L.Ed.2d 55, 60-61, 98 S.Ct. 923]; *Freeman* v. *Hewit, supra,* 329 U.S. 249, 252 [91 L.Ed. 265, 278-279]; *Cooley* v. *Board of Wardens of Port of Philadelphia et al.* (1852) 53 U.S. (12 How.) 298, 339 [13 L.Ed. 996].)

Consistent with the foregoing general principles and with specific application to aviation, we have previously acknowledged that commercial flights which are conducted in strict compliance with federal regulations may not be enjoined as nuisances, both because of the continuing public interest in air transportation, and because of the likelihood of direct conflict with federal law. (*Loma Portal Civic Club* v. *American Airlines, Inc., supra,* 61 Cal.2d 582, 591.) In so holding, however, we expressly cautioned that our decision did not determine the "rights of landowners who suffer from airplane annoyances to seek damages from the owners or operators of aircraft *or to seek compensation from the owner or operator of an airport.*" (*Ibid.*, italics added.) Preemption, we observed, did not operate *per se* to preclude the enforcement of private state remedies for aircraft noise damage, and only a "compelling federal interest" would support a finding that Congress intended to nullify state-created rights. (*Id.*, at p. 592.)

█ Is there a "compelling federal interest" which precludes state imposition of nuisance liability upon the proprietor of an airport? If so, it will be revealed in current statutory and decisional law which we examine.

The Federal Aviation Act of 1958, as amended (Act) (49 U.S.C.A. § 1301 et seq.; all statutory references are to 49 U.S.C.A. unless otherwise cited) grants the FAA exclusive control over aircraft takeoffs, landings, and air navigation. (§ 1348(c); see 14 C.F.R. pts. 1-171.) Acting through the FAA, the federal government also provides construction grants for needed airports under agreements which require extensive

federal supervision of their location, layout, design, and environmental compatibility. (§§ 1716(c)-(e), 1718(a)(3), (a)(4), 1719.) Section 1718(a)(1) requires that airports so subsidized must be available for public use on "fair and reasonable terms and without unjust discrimination,..." The federal government has also been involved in aircraft noise control. Since 1968 the FAA and, more recently, the Environmental Protection Agency (EPA) have been under congressional mandate to establish maximum noise emission levels for operating aircraft (§ 1431(b)(1)); and preliminary federal noise control standards have been in effect since 1969 (14 C.F.R. § 36.1 et seq.).

Shortly after the adoption of the Act the Supreme Court majority in *Griggs* v. *Allegheny County* (1962) 369 U.S. 84 [7 L.Ed.2d 585, 82 S.Ct. 531], reaffirmed the obligation of a public entity to compensate, through the inverse condemnation remedy, for *property* "taken" when excessive airport noise prevents the peaceful use and occupancy of residential land. The rights of property owners in this situation were fully respected. (See also *Aaron* v. *City of Los Angeles* (1974) 40 Cal. App.3d 471, 483-486 [115 Cal.Rptr. 162], *cert. den.* (1975) 419 U.S. 1122 [42 L.Ed.2d 822, 95 S.Ct. 806].)

Subsequently, however, when a preemption issue arose within the context of assertion of the local police power, the high court majority held that the Act, as amended by 1968 and 1972 federal noise control laws, had completely preempted local regulation of "aircraft in flight" for the purpose of aviation noise abatement. (*City of Burbank* v. *Lockheed Air Terminal* (1973) 411 U.S. 624 [36 L.Ed.2d 547, 93 S.Ct. 1854].) Interpreting the foregoing Act the high court, in invalidating an ordinance of the City of Burbank which imposed a night curfew on jet flights at the privately owned Hollywood-Burbank Airport, reasoned that the federal legislation demonstrated an implicit congressional intent to give to the FAA and EPA full control over aircraft flight and aviation noise. The *Burbank* court concluded that the widespread imposition of local curfews would frustrate flight scheduling and navigational patterns nationwide, thus hindering commerce, aviation safety, and the general FAA management of the national air traffic network (pp. 637-640 [36 L.Ed. 2d pp. 555-557].)

While thus precluding local regulation of aircraft noise under the police power, the *Burbank* court expressly refrained from imposing similar limitations on the rights and obligations of a *proprietor-landlord* to control aircraft noise levels. The high tribunal carefully noted that con-

gressional committees which were considering the 1968 and 1972 laws had affirmed the Department of Transportation/FAA views that federal law did not preempt the exercise of reasonable, non-discriminatory proprietary control over land use planning, design and location of runways, aircraft noise limits, and curfews. Specifically referring to a letter from the Secretary of Transportation to a senate subcommittee which was considering the 1968 noise control legislation, the court said: "The letter from the Secretary of Transportation also expressed the view that 'the proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport* [italics in original], from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners *acting as proprietors* [italics in original] can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.'....[¶] [W]e are concerned here not with an ordinance imposed by the City of Burbank as 'proprietor' of the airport, but with the exercise of police power....Thus, authority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits, if any, apply to a municipality *as a proprietor* [italics added]." (Pp. 635-636, fn. 14 [36 L.Ed.2d p. 555]; see Sen.Rep. No. 1353, 90th Cong., 2d Sess. (1968), 1968 U.S. Code Cong. & Admin. News, pp. 2688, 2693; cf. Sen.Rep. No. 92-1160 2d Sess. (1972), 1972 U.S. Code Cong. & Admin. News, pp. 4655, 4663.)

The careful distinction drawn by the Supreme Court between proprietary duties and police power regulation is supported administratively by the FAA, which both before and after *Burbank* has publicly emphasized the local airport operator's responsibilities for noise control. (E.g., FAA, Dept. of Transportation, Aviation Noise Abatement Policy (Nov. 1976) at pp. 5, 32-34; 14 C.F.R. §§ 36.9, 399.110(f); 34 Fed.Reg. 18355 (1969).)

In the wake of *Burbank,* however, there has been no appellate agreement on the scope of the so-called "proprietor exception" to the federal preemption rule and its effect on the tortious liability of airports. Some federal courts have held that the effect of *Burbank* is to bar airport proprietors from restricting the patterns, frequency, and scheduling of flights, and to prohibit any limitation on the permissible types of aircraft. (*Luedtke* v. *County of Milwaukee* (7th Cir. 1975) 521 F.2d 387, 390-391 [absolving proprietor of nuisance liability for airport noise]; *County of Cook* v. *Priester* (1974) 22 Ill.App.3d 964 [318 N.E.2d 327,

330-332].) Other courts, while agreeing that proprietors may not regulate *aircraft* have held that airport operators do retain responsibility for the proper construction, operation, and 'maintenance of ground facilities, and for land use planning designed to minimize the effects of noise. (E.g., *Air Transport Association of America* v. *Crotti* (N.D.Cal. 1975) 389 F.Supp. 58, 63-64.)

Several federal courts, supporting the FAA position, have interpreted *Burbank* as recognizing the power of a proprietor to impose airport use restrictions to the extent that they are reasonable and nondiscriminatory. In two cases involving flights of the Concorde supersonic transport (SST) airplane the second circuit concluded that New York City's John F. Kennedy Airport may impose reasonable noise limitations, the effects of which might preclude the commencement of SST service. (*British Airways* v. *Port Authority of New York, Etc.* (2d Cir. 1977) 564 F.2d 1002, 1011; *British Airways Bd.* v. *Port Authority of New York* (2d Cir. 1977) 558 F.2d 75, 82-85.) A lower federal court has upheld the right of a noncommercial municipal airport to impose a *Burbank*-type curfew. (*National Aviation* v. *City of Hayward, Cal.* (N.D.Cal. 1976) 418 F.Supp. 417, 424-425.)

In *San Diego Unified Port Dist.* v. *Superior Court* (1977) 67 Cal. App.3d 361 [136 Cal.Rptr. 557] (cert. den. *sub nom. Britt et al.* v. *San Diego Unified Port District et al.*, 434 U.S. 859 [54 L.Ed.2d 132, 98 S.Ct. 184]), the Court of Appeal, while concluding that federal regulation of aviation and aircraft noise preempted the proprietor's control of "aircraft in flight," nonetheless held that a proprietor could be responsible in tort for the noise consequences of its land use planning decisions and improper use and maintenance of its ground facilities (pp. 376-378).

As the *Burbank* court suggests, considering the inverse condemnation burden imposed upon airport owners by *Griggs,* Congress apparently intended to preserve the principle of substantial proprietary control over airport planning, design, and use. (See Comment, *Aircraft Noise: Federal Pre-emption of Local Control: Concorde and Other Recent Cases* (1977) 43 J. Air L. & Com. 753, 777; see also, Airline Deregulation Act of 1978, Pub.L. No. 95-504, 49 U.S.C.A. § 1305(a)(1).) Nonetheless, the related congressional enactments contemplate very considerable federal involvement in the planning and operation of airports. The FAA has apparently invoked both contractual and regulatory authority on several occasions to oppose unilateral proprietor use re-

strictions. (See EPA, Legal and Institutional Analysis of Aircraft Noise and Apportionment of Authority Between Federal, State, and Local Governments (July 1973) at pp. 4/25-4/28.) Furthermore, the *Burbank* opinion strongly suggests that any local noise or use restrictions, by whomever imposed, which substantially upset current air schedules or prevented the use of commercial aircraft which were currently operational would burden to an unacceptable degree both federal aviation policy and interstate commerce. (See Note, *Aircraft Noise Abatement: Is There Room For Local Regulation?* (1975) 60 Cornell L.Rev. 269, 288-293; Note, *Shifting Aircraft Noise Liability to the Federal Government* (1975) 61 Va.L.Rev. 1299, 1333-1335.)

On the other hand, the citizen's rights to the full use, possession, and enjoyment of his property are given a protected status under the law. Since 1873 our statutes have defined an actionable nuisance as "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property...." (Civ. Code, § 3479.) The foregoing authorities recognize that a property owner has an inverse condemnation remedy, constitutionally founded, against the proprietor of an airport for *property* damage or loss caused by noise generated at the facility. We discern no reason either in law or policy why the common law and statutory remedy of nuisance as above defined should not under similar circumstances equally protect the *person* of the owner or the occupant.

We find significance in the depth and continuous nature of City's involvement in the creation and maintenance of the nuisance in question. City concedes that it, and not the federal government, decided to build and then to expand the airport in the immediate vicinity of a residential area. It is undeniable that City chose the particular location and direction of the airport runways. It approved their usage by jet aircraft. It entered into service agreements with commercial air carriers all with full and prior knowledge of the potential noise impact. (See *City of Los Angeles* v. *Japan Air Lines Co., Ltd.* (1974) 41 Cal.App.3d 416, 419-422 [116 Cal.Rptr. 69].)

Admittedly, some of the foregoing actions by City followed federal advice, approval, and perhaps even encouragement. Nonetheless, City chose, and was not forced by anyone, to develop LAX in its particular location. City voluntarily elected to expand the facility, with foreknowledge of the preexisting nature and usage of the surrounding area. There

is no evidence before us that City opposed the current level of federally approved jet service at LAX. Fair inferences are to the contrary. (*Id.,* at pp. 422-423.)

Nor has City lacked the means to meet the obligations herein imposed. Since at least 1965, public entities have had statutory power to condemn "aircraft noise...easements," and to secure, in appropriate quantities, land which might otherwise be the subject of noise damage actions. (Code Civ. Proc., § 1240.110, subd. (a) (former § 1239.3); see *City of Oakland* v. *Nutter* (1970) 13 Cal.App.3d 752, 772 [92 Cal.Rptr. 347].) This power and City's responsibility to exercise it in such a manner as to minimize noise at LAX have been publicly acknowledged by airport management. Aircraft landing fees have been established to assist in meeting the costs of land acquisition. (*Japan Air Lines, supra,* at p. 423.) With particular reference to the matter before us, plaintiff's acoustician testified at trial that as early as 1967 he had suggested to LAX officials the economic feasibility of constructing ground barriers to deflect and diminish LAX noise. The soundproofing of adjacent structures and restrictions on noise generated by static engine tests were additional proposed alternatives. Accordingly, City cannot fairly argue that federal law has rendered City powerless to prevent or reduce the damages of which plaintiffs complain.

Pointing to the depth of federal involvement in air navigation and noise abatement and by analogy with a series of United States Supreme Court holdings in the field of labor relations following *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773], City and its amici urge preclusion of any state recognized tort liability for airport noise. In *Garmon,* state courts were held powerless to examine conduct which was either protected or prohibited by the provisions of the National Labor Relations Act (NLRA). However, the *Garmon* principles have been held by the high court itself to be limited by the unique nature of the NLRA which empowers the National Labor Relations Board (NLRB) to develop a uniform national labor policy affecting labor-management disputes within NLRA's scope. (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 194-198 [56 L.Ed.2d 209, 223-226, 98 S.Ct. 1745]; *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 138-139 [49 L.Ed.2d 396, 402-403, 96 S.Ct. 2548]; *Garmon, supra,* at pp. 239-246 [3 L.Ed.2d at pp. 779-784].) Even in labor relations cases, however, *Garmon* has not been interpreted as precluding resolution by the state of disputes which the NLRB could not have resolved, or of disputes in which a state's signifi-

cant interest in protecting its citizens outweighed federal labor considerations. (*Sears, supra,* at pp. 197-198 [56 L.Ed.2d at pp. 225-226]; *Farmer* v. *Carpenters* (1977) 430 U.S. 290, 298-301 [51 L.Ed.2d 338, 348-351, 97 S.Ct. 1056]; *Garmon, supra,* at pp. 243-244 [3 L.Ed.2d at pp. 781-783].)

Our examination of the Act reveals nothing to suggest that FAA possesses any adjudicatory power over noise disputes between airport owners or proprietors, and property owners or occupants. Nor do any federal aviation laws provide for relief to noise victims. On the contrary, the Act specifically provides that its terms shall not abridge "remedies now existing at common law or by statute,..." (§ 1506.) This would seem to preserve the validity of preexisting nuisance causes of action. Recognizing as we do the state's traditional interest in compensating its citizens for damages incurred, whether to person or property, and no reason appearing for extending the *Garmon* doctrine to the airport noise situation, we decline to do so.

Finally, we are not persuaded that preemption is mandated because recognition of a state nuisance remedy would impermissibly hinder commerce or conflict with federal policy. We cannot assume that the imposition of liability on a proprietor for personal injury would burden commerce to an appreciably greater degree than that represented by the well accepted, indeed constitutionally compelled, exposure of the proprietor to property damage claims. While it is true that the probable number of claimants will increase and the nature of the claims enlarge, we discern no basis for any reasoned distinction between claims for property damage and personal injury arising from the same activity and cause.

We therefore hold that the claims for personal injuries founded upon nuisance have not been federally preempted.

### Civil Code Section 3482

█ City contends that LAX cannot be liable for nuisance because the noise generating activity complained of is specifically sanctioned by statutes, federal and state. Particularly, City relies upon Civil Code section 3482.

█ We have consistently applied a narrow construction to section 3482 and to the principle therein embodied. Thus, a number of years

ago we observed, "'A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury.'" (*Hassell* v. *San Francisco* (1938) 11 Cal.2d 168, 171 [78 P.2d 1021], quoting 46 C.J., Nuisances, § 41, p. 674; see also *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 291 [142 Cal.Rptr. 429, 572 P.2d 43]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 938, fn. 16 [101 Cal.Rptr. 568, 496 P.2d 480].)

As we recently confirmed in *Varjabedian,* "A requirement of 'express' authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability." (P. 291.) In a similarly restricted fashion an appellate court has noted that "Accordingly, although an activity authorized by statute cannot be a nuisance, the *manner* in which the activity is performed may constitute a nuisance." (*Venuto* v. *Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 129 [99 Cal.Rptr. 350].)

The planning, location, construction, and operation of airports and the specifications and flight procedures of the aircraft using them are closely regulated by both federal and state law. Both levels of government are pledged, generally, to foster the growth of civil aviation and, specifically, the development of needed air terminals. However, we observed in *Nestle* v. *City of Santa Monica, supra,* that statutes which broadly authorize or regulate airports and aircraft flights do not create a legislative sanction for their maintenance as a nuisance. (6 Cal.3d at p. 938, fn. 16.)

The argument is made that because aviation and noise are necessarily inseparable, governmental approval and encouragement of aviation activity necessarily implies legislative approval of aviation noise which results in interference with neighboring land uses. We disagree. Both federal and state authorities have attempted vigorously to abate aircraft and airport noise. (Pub. Util. Code, §§ 21002, subd. (g), 21669-21669.5.) In addition, as previously noted, the California Legislature has granted airports express and expanded condemnation and compensation authority to reduce and minimize the effects of noise on

the private use and enjoyment of neighboring land. (Code Civ. Proc., § 1240.110, *supra,* Pub. Util. Code, §§ 21690.5 et seq., 21690.20 et seq.) Reasonably construed, the foregoing legislation preserves both the authority and responsibility of an airport proprietor to acquire adequate noise easements and to institute reasonable noise abatement procedures which do not conflict with federal law.

City's reliance on *Lombardy* v. *Peter Kiewit Sons' Co.* (1968) 266 Cal.App.2d 599 [72 Cal.Rptr. 240], is unpersuasive. The *Lombardy* court held that section 3482 barred any nuisance recovery for damages incurred by reason of a vehicular freeway constructed under authority of the Streets and Highways Code (p. 605). While we did not reach the question of the continued validity of *Lombardy* in *Varjabedian, supra* (20 Cal.3d at pp. 291-292, fn. 6), we did reiterate that our *Hassell* test of legislative authorization required a "particularized" inquiry into each statute to ascertain whether there existed a legislative intent to sanction a nuisance. Considered in the airport noise context, the *Lombardy* analysis of the laws therein presented does not persuade us that the Legislature intended that immunity from traditional nuisance liability is statutorily conferred. To the contrary, we hold that no such immunity derives from section 3482 or any other related federal or state statute.

### *Prejudgment Interest*

■ City contends that the trial court improperly awarded prejudgment interest under Civil Code section 3288 for the personal injuries and emotional distress sustained by reason of the airport noise. We agree with the contention.

Section 3288 recites, "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." We have recently affirmed that, unlike Civil Code section 3287, which relates to liquidated and contractual claims, section 3288 permits discretionary prejudgment interest for unliquidated tort claims. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814-815 [148 Cal.Rptr. 22, 582 P.2d 109].) In *Bullis,* we characterized prejudgment interest as "awarded to compensate a party for the loss of his or her *property.*" (*Id.,* at p. 815, italics added; see also *Nordahl* v. *Department of Real Estate* (1975) 48 Cal.App.3d 657, 665 [121 Cal.Rptr. 794] ["deprived of the use of his money or property"].) The award of such interest represents the accre-

tion of wealth which money or particular property could have produced during a period of loss. Using recognized and established techniques a fact finder can usually compute with fair accuracy the interest on a specific sum of money, or on property subject to specific valuation. Furthermore, the date of loss of the property is usually ascertainable, thus permitting an accurate interest computation. (*Bullis, supra,* at p. 815.)

However, damages for the intangible, noneconomic aspects of mental and emotional injury are of a different nature. They are inherently nonpecuniary, unliquidated and not readily subject to precise calculation. The amount of such damages is necessarily left to the subjective discretion of the trier of fact. Retroactive interest on such damages adds uncertain conjecture to speculation. Moreover where, as here, the injury was of a continuing nature, it is particularly difficult to determine when any particular increment of intangible loss arose. Acknowledging the problem, the trial court arbitrarily resorted to an "averaging" method applied to both the amount and duration of the loss. In our view this process was impermissibly speculative.

Furthermore, a fact finder in assessing a claim of general damages for physical, mental and emotional suffering, possesses full authority to consider the duration of the alleged suffering. Accordingly, the disallowance of any interest on such a claim does not deprive the claimant of compensation for an element of actual damage. To the contrary, its allowance, in fact, may in a given case create a double recovery.

For the foregoing reasons, some respected commentators have disapproved the allowance of prejudgment interest on a claim of general damages for suffering. (E.g., McCormick, Damages (1935) § 57, p. 226; Comment, *Interest as Damages in California* (1958) 5 UCLA L.Rev. 262, 264, 271; see also Rest., Torts, § 913(2).) No California courts have previously extended section 3288 to general damages for personal injury, and the prevailing common law view in other jurisdictions appears to be that prejudgment interest is inappropriate in such cases. (See authorities collected in 22 Am.Jur.2d (1965) Damages, § 191, p. 269, fn. 8.) We conclude that the better rule disallows prejudgment interest on the nuisance claim.

### Counsel Fees

█ The trial court awarded plaintiffs' counsel attorney's fees in the amount of $200,000. In making the award the court did not segregate

the fees on the basis of any particular allocation to the direct condemnation, inverse condemnation and nuisance-personal injury phases of the suit. This is necessary. Attorney's fees may be granted in direct condemnation proceedings (Code Civ. Proc., §§ 1235.140, subd. (b) (former § 1255a, subd. (c)), 1268.710 (former § 1255)), but only when and if the trial court makes those statutory findings required by Code of Civil Procedure section 1250.410 (former § 1249.3). The trial court made no such findings. Attorney's fees are clearly recoverable and appropriate with respect to inverse condemnation. (*Id.*, § 1036 (former § 1246.3).) The parties agree that counsel fees may not be assessed with respect to the personal injury claim. (*Id.*, § 1021; *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6 [148 Cal.Rptr. 419, 582 P.2d 1010].)

The trial court's award of counsel fees substantially discounted counsel's original claim of $352,000. We express no opinion as to the propriety of the amount of fees awarded by the trial court, leaving the determination to its sound discretion. We are unable to ascertain, however, whether the fees which were assessed were actually based upon services rendered to plaintiffs in establishing those theories of recovery in which the law permits the allowance of fees. We must accordingly remand the case for an appropriate allocation of attorney's fees, limiting their award to recovery under those causes of action which statutorily permit their assessment.

The judgment appealed from is affirmed. The order after judgment is reversed insofar as it awards (1) prejudgment interest on the personal injury claims, and (2) attorney's fees, and is otherwise affirmed. The cause is remanded to the trial court for further proceedings for the purpose of determining what attorney's fees should be awarded plaintiffs under the principles and limitations herein expressed. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 26(a).)

Tobriner, J., Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.

**BIRD, C. J.,** Concurring.—I write separately since the majority's preemption analysis contains a significant flaw which may spawn unnecessary future litigation.

The majority opinion holds that a tort action may be brought against airport proprietors for personal injuries resulting from airport noise

since federal law has not preempted this area. The fundamental weakness of the opinion is not its result but its reasoning. Although the opinion discusses congressional intent, the opinion ultimately supports its holding with a misplaced reliance on inverse condemnation law. (Maj. opn., *ante,* at p. 98.) In an inverse condemnation action, the property owner alleges that his constitutional rights were violated because his property was taken without just compensation. Preemption is *not* in issue since federal regulations cannot preempt constitutionally protected rights.

Any preemption analysis should place reliance upon, and not merely give lip service to, congressional intent. The determinative inquiry is whether either (1) the federal regulation is so extensive that it evidences a congressional design to preempt the field or (2) there is actual conflict between the proposed local action and the federal regulation such that the two schemes of regulation cannot both stand. (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 141 [10 L.Ed.2d 248, 256, 83 S.Ct. 1210].)

The related congressional enactments contemplate considerable federal involvement in the construction, supervision and operation of jet aircraft and the airports which serve them. The Federal Aviation Act provides that, "[t]he United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace of the United States...." (49 U.S.C. § 1508(a).)[1] This act authorizes the administrator of the Federal Aviation Administration (FAA) to develop rules and procedures for the safe and efficient use of navigable airspace as well as the certification of aircraft, airmen, commercial air carriers and airports. (§§ 1348(c), 1371, 1429, 1430, 1432.) Under these statutes, the FAA is required to regulate the flight patterns of civil aircraft including the procedures and routes used in takeoff and landing. (14 C.F.R. pts. 1-171.)

There are specific provisions which relate to noise control. For example, the FAA, after consultation with the Environmental Protection Agency, is required to provide "for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment, modification, suspension,

---

[1]All statutory references are to title 49 of the United States Code, unless otherwise indicated.

or revocation of any certificate authorized by this subchapter." (§ 1431(b) (1).) If federal subsidies are being received, the FAA may also exert control over the planning, design, location, construction, layout, environmental compatibility and intergovernmental coordination of airport projects. (§§ 1716(c)-(e), 1718(a)(3), 1718(a)(4), 1719.)

While federal regulation is extensive, both the legislative and executive branches have publicly emphasized local airport operators' responsibility for controlling airport noise through reasonable nondiscriminatory regulation. For example, the Senate Commerce Committee Report which discussed the anticipated effects of the Federal Aviation Act, quoted with approval the following language of the Secretary of Transportation: "[t]he proposed legislation will not affect the rights of a state or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory." (Sen. Rep. No. 1353, 90th Cong., 2d Sess.; 1968 U.S. Code Cong. & Admin. News, pp. 2688, 2694.)

Similarly, the House Interstate and Foreign Commerce Committee Report indicated that the Congress did not intend to preempt this area. "Rather, the committee expects manufacturers, air carriers, all other segments of the aviation community, the State and local civic and governmental entities to continue and increase their contributions toward the common goal of quiet." (H.R.Rep. No. 1463, 90th Cong., 2d Sess., p. 4.) In *British Airways Bd.* v. *Port Authority of New York* (2d Cir. 1977) 558 F.2d 75, 82, the United States Department of Justice filed an amicus brief in which it "denied that existing legislation authorized the Executive under any circumstances to preempt airport proprietors from promulgating their own noise regulations." Finally, the FAA and the United States Department of Transportation, in a statement of Aviation Noise Abatement Policy, said: "Airport proprietors are primarily responsible for planning and implementing action designed to reduce the effect of noise on residents of the surrounding area. Such actions include optimal site location, improvements in airport design, noise abatement ground procedures, land acquisition, and restrictions on airport use that do not unjustly discriminate against any user, impede the federal interest in safety and management of the air navigation system, or unreasonably interfere with interstate or foreign commerce." (FAA, Dept. of Transportation, Aviation Noise Abatement Policy (Nov. 18,

1976) p. 5.) "Our concept of the legal framework underlying this policy statement is that proprietors retain the flexibility to impose such restrictions if they do not violate any Constitutional proscription. We have been urged to undertake—and have considered carefully and rejected —full and complete federal preemption of the field of aviation noise abatement. In our judgment the control and reduction of airport noise must remain a shared responsibility among airport proprietors, users, and governments." (*Id.*, at p. 34.)

The Supreme Court recognized this limitation of federal control in *City of Burbank* v. *Lockheed Air Terminal* (1973) 411 U.S. 624 [36 L.Ed.2d 547, 93 S.Ct. 1854]. A municipality, acting under its *police power,* was held to have acted improperly in enacting nighttime jet curfews of flights emanating from or landing at a privately owned airport since this type of local regulation was held to be federally preempted. The court reasoned that widespread imposition of local curfews could frustrate flight scheduling and navigational patterns nationwide, thus burdening interstate commerce, aviation safety, and the FAA's management of the air traffic network. (*Id.*, at pp. 639-640 [36 L.Ed.2d at pp. 556-557].) Nevertheless, the Supreme Court explicitly stated that their decision did not decide in any way the rights of airport operators, acting in their *proprietary* capacity, in regulating airport use to abate noise. (*Id.*, at p. 635, fn. 14 [36 L.Ed.2d at p. 555].)

Although post-*Burbank* judicial decisions have disagreed on the scope of the so-called "proprietor exception," those decisions make clear that not all proprietor regulations have been federally preempted. Several cases have recognized a proprietor's power to impose airport use restrictions where reasonable and nondiscriminatory. (E.g., *British Airways Bd.* v. *Port Authority of New York* (2d Cir. 1977) 564 F.2d 1002, 1011; *British Airways Bd.* v. *Port Authority, supra,* 558 F.2d at pp. 82-85.) Another federal case upheld the right of a noncommercial airport to impose a *Burbank*-style curfew. (*National Aviation* v. *City of Hayward, Cal.* (N.D.Cal. 1976) 418 F.Supp. 417, 424-425.) Virtually all the cases, including those decisions which found proprietor control of aircraft in flight federally preempted, agree that proprietor control over management of *ground facilities* has not been federally preempted. (E.g., *San Diego Unified Port Dist.* v. *Superior Court* (1977) 67 Cal. App.3d 361 [136 Cal.Rptr. 557]; *Air Transport Association of America* v. *Crotti* (N.D.Cal. 1975) 389 F.Supp. 58, 63-64.)

The majority opinion details the activities that were available to the City of Los Angeles (City) to mitigate the harm resulting from its extensive involvement in the creation and maintenance of this particular nuisance. (Maj. opn., *ante,* at pp. 98, 99.) For example, the City could have chosen different locations for its runways. It could have acquired buffer land by its statutory condemnation power. Ground barriers could have been constructed to deflect and diminish Los Angeles International Airport noise and adjacent structures could have been sound-proofed.

It is clear that the pertinent congressional enactments contemplate considerable federal involvement in the planning and operation of airports. The *Burbank* opinion (411 U.S. 624 [36 L.Ed.2d 54]) suggests that any noise or use restriction which substantially interferes with the federal regulatory scheme would burden interstate commerce and improperly limit the FAA's authority. However, it is also clear that substantial nonpreempted regulatory activity could have been undertaken by the City.[2] This failure of the City to act is the correct basis for imposing nuisance liability. It is *not,* as the majority appear to argue, the treatment accorded property owners in inverse condemnation cases. The majority's analogy to inverse condemnation law is not only unnecessary, it is inapposite as well.

With respect to the majority's treatment of the prejudgment interest award, it is important to underscore that the award is invalid only to the extent it represents interest on "the intangible noneconomic aspects of mental and emotional injury' claimed by plaintiffs. (Maj. opn., *ante,* at p. 103.) If plaintiffs allege specific damage that is supported by tangible evidence, prejudgment interest may properly be awarded under Civil Code section 3288. Clearly, there can be no basis in law or reason for distinguishing between awarding interest on an unauthorized withdrawal from a bank checking account, as this court did in *Bullis* v.

---

[2]Defendants argue that the imposition of nuisance liability by the court for failure to undertake nonpreempted activity would itself constitute preempted regulation. This argument is untenable. Imposition of nuisance liability does not constitute regulation. The court is not advising the City on how to run its airport. It is merely making certain that the City remains responsible for the true costs associated with the airport's operation. The City retains the power to take any action it pleases. The City may acquire buffer land, soundproof the airport's runways, or continue its airport's operations and pay its neighbors for any damage that accrues. Moreover, defendants' position ignores the express language of 49 United States Code section 1506 that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.'

*Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814-815 [148 Cal.Rptr. 22, 582 P.2d 109], and awarding interest on a paid medical bill arising out of a defendant's tortious conduct. In both cases, the plaintiff has been deprived of the use of his money and "the accretion of wealth which [the] money . . . could have produced during [the] period of loss." (Maj. opn., *ante,* at pp. 102-103.)