UNITED STATES of America, in its own right and on Behalf of Torres–Martinez Band of Mission Indians and the Allottees therein, Plaintiffs,

v.

The IMPERIAL IRRIGATION DISTRICT, a Public Irrigation District; and Coachella Valley Water District, a Public Irrigation District, Defendant.

Civ. No. 82–1790–K(M).

United States District Court,
S.D. California.

July 17, 1992.

Peter C. Monson, Lauren N. Soll, Attys., Dept. of Justice, Environment and Natural Resources Div., Indian Resources Section, Washington, D.C., Michael E. Quinton, Asst. U.S. Atty., San Diego, Cal., for plaintiffs.

Justin M. McCarthy, Steven B. Abbott, Redwine and Sherrill, Riverside, Cal., for defendant Coachella Valley Water Dist.

Paul D. Engstrand, Gerard Smolin, Jr., Robert C. Hawkins, Jennings, Engstrand, Henrikson, San Diego, Cal., for defendant Imperial Irr. Dist.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEEP, Chief Judge.

This matter came before the court for court trial June 9–30, 1992. Plaintiffs are the United States of America and the Torres–Martinez Band of Mission Indians; hereinafter the words "band" or "Torres–Martinez" will refer to both the United States and the Torres–Martinez Band of Mission Indians unless otherwise indicated. They were represented by Peter Monson and Lauren Soll of the U.S. Department of Justice. Defendant Imperial Irrigation District (hereinafter IID) was represented by Paul D. Engstrand and Gerald Smolen, Jr. Defendant Coachella Valley Water District (hereinafter CVWD) was represented by Justin McCarthy and Steven B. Abbott.

Having considered the voluminous body of evidence and the well-prepared arguments of counsel, the court makes the following preliminary observations, findings of fact and conclusions of law.

### I. *Preliminary Observations*

The court wishes to make two preliminary observations. First, the court believes that all counsel in this case deserve formal commendation for their preparation and professionalism. This is a difficult case for a number of reasons and all counsel spent an enormous amount of time mastering the often contradictory and convoluted historical record which is the nucleus of this lawsuit. Also, in a profession where "civility" has become a goal rather than a habit, the courtesy of counsel was remarkable in the face of the tension of a complicated trial with over 2,000 exhibits generated.

Second, this case illustrates the wisdom of a relatively short statute of limitations. Due to 28 U.S.C. § 2415, which created a special statute of limitations for Indian cases, the damages sought in this case span from 1924 through today and into the future, excluding July 18, 1966, through September 29, 1976.[1]

Because critical acts occurred in the 1920's and in 1949 and 1950, in the fact-finding process the court has had to rely on historian witnesses in analyzing "snippets" of history. Key witnesses have died and key exhibits have disappeared during the last 70 years. In the records which have been located, both sides to this lawsuit can find evidence which reasonably supports their different positions, and finding perci-pient witnesses to explain this evidence is, obviously, impossible. At times notes or file stamps in the same exhibit reasonably can be used by both sides to corroborate such things as their theory of the intent of the President in the 1924 and 1928 land withdrawals, which intent is central to a resolution of this case. Without the excel-lent assistance of counsel, resolution of this case would have been impossible; with their aid, it is nearly so. So conceding, the court turns to the facts of this case.

## II. *Jurisdiction, Venue, and a Summary of the Issues Requiring Adjudication*

In this action, the United States of America is suing the defendant water districts on its own behalf and on behalf of the Torres–Martinez Band of Mission Indians and their allottees. There is one cause of action, for trespass. The theory of the case is that irrigation water draining from the agricultural fields located in the two water districts flows into the Salton Sea, raising the level of the Sea and causing it to inundate Indian lands. The plaintiffs seek damages for trespass from 1924–1992 excluding July 18, 1966 through September 29, 1976, pursuant to the statute of limitations provided for in 28 U.S.C. § 2415(b) and (g). Also, they seek damages to compensate them for the cost of restoring the soil and future damages for 10 years on the theory that it will take 10 years for the Sea to evaporate. Finally, they seek an injunction against continued inundation.

Defendants offer the affirmative defense of consent. Specifically, they allege that the inundation of the Indian land occurred with the consent of the government pursuant to public land withdrawals in 1924 and 1928. Alternatively, defendants argue that if there was no consent when the public land was withdrawn in 1924 and 1928, there was consent by the government in 1950 when Congress specifically recognized a boundary for the Salton Sea 220 feet below sea level and authorized the Secretary of Interior to purchase Indian lands located within the −220′ perimeter.

Federal jurisdiction and venue are proper. This court has jurisdiction because this is a civil action for trespass brought by the United States as plaintiff. 28 U.S.C. § 1345. The complaint seeks declaratory relief as well as monetary damages and an injunction. 28 U.S.C. § 2201. Venue is appropriate because a portion of the subject reservation lands are located in the Southern District of California, both defendants maintain their principal place of business in the State of California, and defendant IID maintains its principal place of business in the Southern District of California. 28 U.S.C. § 1391(b).

## III. *Background Facts*

Preliminarily, the court concedes that counsel and some witnesses are much more

---

1. Until the enactment of 28 U.S.C. § 2415, on July 18, 1966, claims brought by the United States on behalf of Indians were not subject to a statute of limitations. That statute provided that all claims accruing before July 28, 1966, would be subject to an absolute filing deadline of January 6, 1984. 28 U.S.C. § 2415(g). All claims accruing after July 18, 1966, were subject to a six-year, ninety-day period of limitation.

The complaint in this case was filed December 28, 1982. As such, the claims accruing before July 18, 1966, are timely because they were filed before the absolute deadline of January 6, 1984. The claims accruing on or after September 29, 1976, are timely because they were filed within six years and ninety days of accrual. The claims accruing between July 18, 1966 and September 29, 1976, are barred because they were not filed within the six-year, ninety-day period.

familiar than is the court with the history of the Boulder Canyon Dam Project and the development of the distribution and drainage systems in the Imperial Valley and Coachella Valley, as well as with development of the agricultural economy in those two valleys. The trial briefs and Exhibits 2382 and 2363 contain a thorough discussion of the relevant history. What follows is a brief synopsis of relevant portions of the history which is necessary for an understanding of the issues in this lawsuit.

## A. The Salton Sea

The Salton Sea straddles the common boundary of Riverside and Imperial Counties. It is an inland salt water lake lying within the Salton Basin of Southern California. The basin encompasses parts of Riverside, Imperial, and San Diego Counties, as well as part of Baja California. Its low point is 275 feet below sea level. As of late 1990, the sea level was −227.7′ [2]; it contained about 6,828,850 acre feet of very salty water and spanned a surface area of approximately 239,750 acres.

The Salton Basin is a closed basin which has no natural outlet to the Pacific Ocean. Water within the basin drains by gravity into the Salton Sea. Water depletion from the Sea is primarily by evaporation as the soil beneath the Sea is composed predominately of clay. During the 400 years prior to 1905, the Sea was essentially dry except for occasional excessive run-off resulting from large storms. Around 1900, when the Sea was at its natural low level, there was salt mining on the edge of the Sea.

From 1905–07 the present Sea was formed when the Colorado River overflowed its banks and water drained into the Salton Basin. In 1906 its highest level of −195′ was reached. The court finds the plaintiffs have proven that the Sea would have receded to its pre-flood level by 1923 but for irrigation in the Imperial Valley and the Coachella Valley. That irrigation has caused the level of the Sea to fluctuate, but essentially it has been at its current level of −227.5′ or greater since 1924.

The Salton Sea has a high salt content for a number of reasons, chief of which are the following. First, the soil in the area is salty and water which drains through the soil into the Sea carries salt with it. There was a previous lake in the area which deposited salt into the low point of the Salton Sea by the process of drainage and evaporation. Second, salt mining was occurring at the edge of the Sea at the time of the 1905–07 flood. All of the salt being mined was carried into the Salton Sea via the flood waters. Third, the Colorado River water used for irrigation is very salty. Because it contains so much salt, approximately 15% water in excess of a plant's consumptive use must be applied to plants and then carried away as salty drainage water in order to irrigate the plants and leech the soil. Gravity drains this water into the Salton Sea.

## B. Torres–Martinez Land Involved in this Lawsuit

The original Torres–Martinez reservation was created in 1876; it consisted of one 640–acre section of land approximately eight miles northwest of the Salton Sea. In 1891, by executive order, the United States reserved additional land for the Torres–Martinez Indians; pursuant to Congressional authority, the Secretary of Interior withdrew additional lands in 1909 for the benefit of the band. The land reserved in 1891 and 1909 was adjacent to the Salton Sea. Many acres were actually inundated with flood water at the time of the withdrawal in 1909. Indeed, all or part of each of the 22 sections of land (over 10,000 acres) reserved in 1909 were covered by water and formed part of the lake bed. All or part of 14 sections of land withdrawn in 1891 were also inundated.

Because the 1891 withdrawal preceded the flood, the parcels withdrawn at that time were not inundated. However, the parcels withdrawn in 1909 were inundated at the time of the withdrawal. The reason this obviously inundated land was withdrawn was based upon a request by the Superintendent of the Martinez Indian School who wrote as follows:

2. The negative values refer to depth below sea level.

This land is not worth very much for it is all very salty but it has under it a fine belt of artesian water. And should it be taken up and farmed it would take a large amount of water from the Indians. It seems that everything should be done that is possible to ensure to the Indians a permanent water supply. Most of this land is now covered by the Salton Sea but as it is receding very rapidly it is only a question of time until it will be subject to entry.

Ex. 2007. Hence, it appears to have been believed that the Sea would recede rapidly and that the land reserved would generate a fresh water supply to the Indian land adjacent to the Sea.

Nonetheless, the bulk of the band's land involved in this lawsuit is still inundated by the Salton Sea in whole or in part today. It has been continuously inundated since 1905 due to the development of the agricultural industry in the Imperial Valley and Coachella Valley in the post-flood years. Whereas it was reasonable in 1909 to assume that the Salton Sea would recede by evaporation to pre-flood levels by 1923, this assumption was based upon a belief that the source of water draining into the Sea would remain the same as prior to the flood. The advent of agriculture in the Imperial Valley and the Coachella Valley, with its attendant irrigation, leeching, and drainage significantly changed the inflow into the Sea.

The tribal land involved in this lawsuit was classified as non-agricultural until 1950. This is because the soil is composed of a high percent of clay, which, until farming techniques were improved around 1950, made the soil impractical to farm. Some parcels are still classified as non-irrigable but many are classified as capable of growing field crops (alfalfa, cotton, corn), row crops (carrots), and tree crops (citrus groves). The Indian lands are not within the Coachella Valley Water District; hence, for farming, they are dependent on underground water.

C. The Imperial Valley and IID

By the late 1800's, the Salton Basin was recognized as a natural agricultural area. In particular, Imperial Valley and parts of the Coachella Valley were perceived as having good soil, which soil with water would be conducive to agriculture. Because of the natural slope of the basin, water would naturally drain by gravity to the Salton Sea so landlocked farms would have a vehicle for leeching and irrigating the soil and removing the salty drainage water.

In the late 1800's, the California Development Company built the Alamo Canal which began importing Colorado River water to the Imperial Valley in 1901. The Alamo Canal water flowed first to Baja California for Mexican use and then to Imperial Valley. This canal was the genesis of the agricultural industry in Imperial County. For example, in the Imperial Valley, approximately 140,000 acres were farmed in 1908, and over 400,000 acres were farmed in 1919.

The Alamo Canal proved unsatisfactory because the amount of water flowing to the Imperial Valley from Mexico was inconsistent and unpredictable, and because silt frequently clogged the canal. For these reasons, in a message to Congress in 1907, President Roosevelt recommended construction of the All–American Canal. That canal finally was completed and started delivering water to Imperial County in 1940. Essentially, the All–American Canal operated on the same principal as the Alamo Canal: by gravity, the Colorado River water was transported from Arizona to Imperial County. After its use for farming, the drainage water flowed by gravity to the Salton Sea.

In 1909, the Imperial Irrigation District (IID) was formed. It assumed the responsibility of providing irrigation water and drainage facilities to the Imperial Valley. It still maintains that responsibility today, and it is for this reason that it is a defendant in this lawsuit.

D. Coachella Valley and CVWD

The Coachella Valley developed more slowly than the Imperial Valley, primarily because of water. It should be noted that the Indian lands involved in this lawsuit are located in the lower Coachella Valley, on the northwest side of the Sea. Until 1950,

the settlers in the Coachella Valley irrigated their lands with groundwater, which the court finds was subject to overdrafts as early as 1920. The CVWD was formed in 1918; a primary function of the water district was to manage the groundwater basin and obtain imported supplies of water to augment the groundwater supply.

After World War II, the Coachella Valley grew in population and acres of agricultural use, primarily because it was known that the Coachella Valley would be receiving Colorado River water via the Coachella Canal, a joint construction project with the United States government and the CVWD. The Coachella Canal began delivering water to Coachella in 1950.

As is true with farming in the Imperial Valley, because of the salty soil, and because of the high salt content in the Colorado River water, extensive leeching and drainage must occur to control the salt content of the soil and keep it productive. The salty drainage water flows by gravity from farms in the Coachella Valley into the Salton Sea.

### III. *Trespass*

■ As noted, plaintiffs seek damages and an injunction against defendants based on a theory of trespass. Trespass is the intentional use of the property of another without authorization and without privilege. W. Page Keeton et al., *Prosser and Keaton on the Law of Torts* § 13 at 70 (5th ed. 1984). Any physical entry upon the surface of the land is a trespass, including flooding land with water. *Id.* at 72. The intent required is simply an intent to be on the land. *Id.*

■ The court finds by a preponderance of the evidence that the "Area A" lands and "Area B" lands, see exh. 2333, which are the subject of this lawsuit, are lands held in trust by the United States government for the benefit of the Torres–Martinez band. Despite IID's vigorous challenge of Ms. Lila Ladue's testimony and affidavit, the court is satisfied that the status of the lands has been proven. In sum, the United States received the lands from Mexico pursuant to the Treaty of Guadalupe Hidalgo. In 1891 and 1909, the federal government withdrew the lands for the benefit of the band. Since that time, the Indian lands have been held in trust by the United States for the Torres–Martinez band.

There is no dispute that the Area A lands and the Area B lands have been significantly inundated by water: several parcels have been totally inundated since 1905–07. Further, there is no dispute that the defendants possess the general intent to be on the land. The sole issue as to liability is whether the entry of the water on the Indian lands was by consent.

■ The defendants are not contending that the band itself consented to the flooding of their lands. Rather, it is their contention that Congress or the President, pursuant to a valid delegation of authority, consented to the flooding of the Indian lands. They offer alternative theories of consent. First, they argue that by the public land withdrawals of 1924 and 1928 which created a public water reserve (hereinafter "PWR's") in the Salton Sea, the President clearly indicated an intent to withdraw most of the land involved in this lawsuit. The purpose of the withdrawal was to create a salt water reserve to hold the drainage water caused by farming in Imperial Valley and Coachella Valley. Hence, defendants argue the PWR's are an expression of Executive intent to allow the trespass involved in this lawsuit. Second, the Act of August 25, 1950, specifically authorizes the Secretary of Interior to purchase any Indian lands located below a contour line of −220'. The lands below −220' were to be reserved for the purpose of maintaining a drainage reservoir not to be disposed of without the consent of Congress. Defendants urge that the explicit intent to maintain a drainage reservoir below −220', and the authority of the Secretary of Interior to buy Indian land, clearly shows that Congress knew that Indian land was being flooded and gave its permission by authorizing the purchase of land below −220'. A peaceful entry on land by consent is not actionable. 75 Am.Jur.2d *Trespass* § 74 (1974). Consent by the owner is an absolute and valid defense to an action

for trespass. However, consent must be granted by one in possession, by one entitled to possession of the premises, or by one otherwise competent and authorized to give such consent. *Id.* at 84.

▮▮▮ Generally, the burden of proving consent is on the defendant. *See Rosenthal v. Crystal Lake,* 171 Ill.App.3d 428, 121 Ill.Dec. 869, 525 N.E.2d 1176 (1988); *Mrs. Joe Miles v. Huff's Foodtown, Inc.,* No. 85–158–II, 1986 WL 1786 (Tenn.Ct.App. Feb. 11, 1986). *Stone Resources Inc. v. Barnett,* 661 S.W.2d 148 (Tex.Ct.App.1983); *cf., Posey v. Leavitt,* 229 Cal.App.3d 1236, 280 Cal.Rptr. 568 (1991). The parties have been unable to cite any case that defines when effective consent to trespass is given by Indians or the United States Government on the band's behalf. However, government counsel persuasively argues that because of the unique protected status that Indians have under the law, the burden should be defined as whether defendants have proven by clear and convincing evidence congressional or presidential intent to abrogate the band's rights to the subject lands by consenting to the flooding of them. The defendants basically have conceded that this is their burden. Hence, the court will evaluate the evidence of consent pursuant to this standard.

As to the issue of how consent is proved, the court relies heavily on two cases which deal with abrogation of Indian treaty rights. These are *United States v. Dion,* 476 U.S. 734, 742, 106 S.Ct. 2216, 2221, 90 L.Ed.2d 767 (1986), and *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). In *United States v. Dion,* the Court noted that courts have sometimes required Congressional intent to abrogate Indian treaty rights to be express, and at other times courts have looked to a statute's legislative history and surrounding circumstances in addition to the statutory language itself. The Court stated that although an explicit statement of intent to abrogate Indian treaty rights is preferable, it was rejecting a *per se* rule:

> [W]here the evidence of congressional intent is sufficiently compelling, "the weight of authority indicates that such

an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." (citation omitted). *What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve the conflict by abrogating the treaty.*

*Id.* 476 U.S. at 739–740, 106 S.Ct. at 2220–21 (emphasis added).

The second case which provides guidance on how to evaluate consent is *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). In *Rosebud,* the Court found that an unratified treaty and three Congressional acts occurring over a 10–year period demonstrated clear intent by Congress to disestablish Indian title to lands involved in the lawsuit. In 1901, Congress had negotiated a treaty with the tribe for the sale of land to white settlers. The treaty was never ratified. The Court found that this unratified treaty evinced an "unmistakable baseline purpose of disestablishment." *Id.* at 592, 97 S.Ct. at 1366. Thereafter, there were additional government negotiations with the band for the purpose of purchasing the land, but no treaty was signed. By acts of 1904, 1907, and 1910, Congress adopted legislation concerning the same land and containing substantially the same provisions as had been agreed to in the 1901· unratified treaty. The court found that there was a "continuity of intent" which indicated that in the 1904, 1907, and 1910 acts, Congress intended to disestablish Indian title. *Id.* at 606, 97 S.Ct. at 1373.

▮▮▮ From *Rosebud* and *Dion* it is clear that a statute need not on its face express an intent to abrogate Indian treaty rights. Although such facial expression of intent is preferable, the court can look to legislative history and the history of dealings between the band, the defendants and the government concerning the property at issue to determine whether there was a clear intent by Congress to abrogate Indian treaty rights. Furthermore, although no case has been cited to the court defining

presidential intent to abrogate Indian rights, logically the same standards should apply to the President as apply to Congress, since he was acting pursuant to delegation of authority from Congress.

■ I turn then to an analysis of the alternative theories of consent, using the standard suggested by the United States: have the defendants proven by clear and convincing evidence that Congress or the President intended to abrogate the band's rights to the subject lands by consenting to the flooding of them. In assessing intent under *Rosebud* and *Dion*, there must be evidence both that Congress or the President recognized that the affected land was Indian land, and that Congress or the President clearly intended to abolish Indian rights in the affected land.

## IV. *The PWR's of 1924 and 1928*

June 25, 1910, Congress approved two acts which are at the heart of the controversy in this lawsuit. First, 36 Stat. 858 provides that:

The Secretary of the Interior be and is hereby authorized in his discretion to reserve from location, entry, sale, allotment or other appropriation any lands within any Indian reservation, valuable for power or reservoir sites, or which may be necessary for use in connection with any irrigation project heretofore or hereafter to be authorized by Congress.

Act of June 25, 1910, ch. 431, 36 Stat. 855, 858 (1910). The second act is 36 Stat. 847. Pursuant to this bill, Congress delegated to the executive branch the power to withdraw any of the public lands of the United States. Act of June 25, 1910, ch. 421, 36 Stat. 847 (1910).

To assure that the drainage sink was preserved and protected, in the early 1920's IID began acquiring the private lands and railroad lands under and around the Salton Sea below an elevation of −220'. For the same reason, IID also petitioned the United States to withdraw public lands roughly below the −220' contour. An interesting anecdote to the petition is contained in a letter from the Director of the U.S. Geological Survey to officials at the General Land Office about IID's petition:

Another method of procedure is the granting of an easement under the Act of March 4, 1917, (39 Stat. 1197). Such action, however, would give the district control over a large area of public land and complicate any adjustment or other use of the Salton Sea which may at some future time seem expedient.

Exh. 2043.

The Secretary of Interior followed this recommendation and rather than grant to IID an easement in land below the −220' contour, he recommended to the President, and the President approved, two public water reserves, PWR 90 of 1924, and PWR 114 of 1928. The clearly stated purpose of these PWR's was to provide an "evaporation pan for surplus and waste water from Imperial Valley irrigation development." Exhs. 2058 and 2044. The irrigation reserve created by the PWR's was roughly along the −220' line, although the perimeter created by them was irregular.

The parties do not dispute that Congress has the authority to abrogate an Indian's treaty rights, and that this authority may be validly delegated to the President. Also, there is no dispute that 36 Stat. 847 and 36 Stat. 858 validly delegated to the President authority to withdraw public lands and Indian lands. The dispute is whether the President knew that land withdrawn in 1924 and 1928 contained Indian lands.

The defendants urge the two PWR's clearly demonstrate consent to trespass. However, when Presidents Coolidge and Harding withdrew lands in PWR 90 and PWR 114, they only mentioned 36 Stat. 847, the public land withdrawal act. Neither PWR contained a reference to 36 Stat. 858, the statute which explicitly authorizes the withdrawal of Indian lands in connection with any reservoir site or irrigation project.

■ Applying the principles of *Rosebud* and *Dion* to the PWR's of 1924 and 1928, the first issue is whether the withdrawals on their face clearly express an intent to abrogate Indian rights. I hold they do not.

As noted, the two PWR's unambiguously withdraw plots of public land below the −220′ contour. The question is whether reference to the public land withdrawal statute means that the Executive intended only to withdraw non-Indian land or whether he meant to withdraw non-Indian and Indian land.

■ Plaintiff offered testimony that the use of the public land withdrawal statute rather than use of the Indian land withdrawal statute is a clear expression of executive intent *not* to withdraw Indian land in either of the two PWR's. The court rejects this argument. IID submitted convincing evidence that the term "public land" in the early 1900's sometimes was used to mean non-Indian public land, and sometimes was used to mean public land which included Indian land. Hence, a withdrawal based upon the general public land withdrawal statute does not negate automatically presidential intent to abrogate Indian property rights. Further, since the term public land was used inconsistently during the 1920's, the court holds that the face of the 1924 and 1928 PWR's is ambiguous as to what land is meant to be withdrawn.

■ Having found the face of the withdrawals to be ambiguous, pursuant to *Rosebud* and *Dion*, the court looks to the history of the dealings between the parties and the legislative history to construct the meaning of the PWR's.

The dealings between the government, the defendants, and the band do not clarify the issue of whether the President knew that the lands being withdrawn in 1924 and 1928 contained Indian land. IID initiated the PWR's of 1924 and 1928 by a petition: IID's initial petition to the government to withdraw the lands referred to "public lands," and did not mention Indian land specifically. From historical evidence presented, it is absolutely clear that the executive knew that lands roughly below the −220′ contour were being flooded pursuant to the irrigation project established by the Boulder Canyon Dam Project. Also, it is clear that it is this basin the withdrawals sought to protect. What is not clear is

whether anyone in a position of authority in implementing, planning, or supervising the project appreciated that among the lands being inundated were Torres-Martinez lands, and if so, whether that information was communicated to the Executive. The record is silent as to this question.

Turning to the legislative history, or in this case, the executive history surrounding the withdrawals, it is clear that the Secretary of Interior should have known that the land being withdrawn in 1924 and 1928 contained Indian land. IID's original petition for withdrawal contained a map, since lost, outlining the lands which it desired to have withdrawn. The petition and map were referred to the General Land Office, an office under the supervision of the Secretary of Interior. It is also clear that there were on file in the General Land Office other accurate maps of the Salton Sea and surrounding area which contained accurate plot references to Torres-Martinez land. If government was working the way it should work, the fact that Indian land was contained within the proposed withdrawal areas should have been drawn to the attention of high-ranking officials considering the public land withdrawals. And, the court is persuaded by Mr. Langley's testimony that the Boulder Canyon Dam Project was a high priority government project and the government was working very professionally in supervising and implementing the project.

Nonetheless, despite the priority of the project, and despite the thoroughness of the manner in which it was executed, there is no mention in any historical record that, in fact, it was drawn to the attention of anyone considering the withdrawals, such as the President or the Secretary of Interior, that the lands involved in either of the PWR's contained Indian lands. Furthermore, the Act of August 25, 1950 (discussed more fully in the next section), specifically authorized the Secretary of Interior to purchase any Indian lands located below a contour line of −220′. This subsequent legislative history casts further doubt on the President's intent to abrogate

Indian rights to the subject lands when he made the withdrawals. It could be, as defendant suggests, that the authorization for payment in 1950 was a corrective measure of what should have occurred in 1924 or 1928. However, at least an equally plausible interpretation is that there finally was an appreciation in the 1950 Act that lands below —220' in the Salton Sea basin contained Indian lands that had never been withdrawn effectively. Hence, for the foregoing reasons, this court rejects the argument that the PWR's of 1924 and 1928 clearly demonstrate presidential intent to abrogate Indian rights in the subject lands by permitting them to be flooded.[3]

### V. *The Act of August 25, 1950*

On August 25, 1950, Congress approved legislation "to provide for disposition of lands on the Cabazon, Augustine, and Torres–Martinez Indian Reservations in California, and for other purposes." Act of August 25, 1950, ch. 780, 64 Stat. 470 (1950). Section 7 of that Act authorized the Secretary to purchase Indian land below the —220' contour line around the Salton Sea for use as a drainage reservoir.[4] The defendants argue that this legislation clearly shows that Congress knew the —220' contour contained Indian land and that Congress intended this land to be used as a drainage reservoir: in sum, they argue that in this legislation Congress clearly has demonstrated an intent to abrogate the band's rights to land below the —220' contour.

The plaintiffs note that the bill authorized the Secretary of Interior to purchase the Indian lands and authorized the appropriation of money to do so. However, they argue that because the Secretary of Interior did not exercise his authority and buy the Indian lands, a condition precedent to the abrogation did not occur and there was no clear, unequivocal consent.

Section 7 of the Act of August 25, 1950, provides in part the following:

The Secretary of the Interior is further authorized to acquire by purchase for and in behalf of the United States, and at such price as may be agreed upon between him and the Indian owners, any Indian lands, whether tribally or individually owned, located under or adjacent to the Salton Sea, below a contour line of two hundred and twenty feet below sea level or lower. The lands so acquired shall be reserved for the purpose of maintaining a drainage reservoir in said Salton Sea and shall not be exchanged or otherwise disposed of without the consent of the Congress. The amount (not to exceed $5,000) required to complete such purchases is hereby authorized to be appropriated out of moneys in the United States Treasury not otherwise appropriated.

64 Stat. 470.

As indicated previously, the relevant inquiry is whether the defendants have proved by clear and convincing evidence that Congress knew that the lands were Indian lands and intended to abrogate the band's rights to the land. For the reasons stated below, the court finds that the statute is ambiguous on its face. Further, the court finds that the course of dealings between the government, the band and the water districts is persuasive evidence that Congress intended in Section 7 of the Act to abrogate Indian rights in Section 7 of the Act. However, the legislative history is ambiguous as to whether Congress did intend to abrogate Indian rights. On balance, since the burden is that consent must be proved by clear and convincing evidence, the court resolves this issue against the defendants.

 Turning first to the language of the statute, the most persuasive reason that defendants advance as to why the statute is not ambiguous is that the language of the statute does not clearly pro-

---

**3.** Defendant IID filed a motion pursuant to Fed. R.Civ.P. 52(c) dealing with this issue which was taken under submission. It is denied for the reasons stated in this section.

**4.** The 1924 and 1928 withdrawals roughly followed the —220' contour, but since the land withdrawn was identified by parcel number, the perimeter established was irregular. In Section 7 of the Act of 1950, Congress specifically set the —220' contour as the perimeter of the basin.

vide that purchase of Indian lands below the −220′ contour is a condition precedent to the establishment of the drainage reservoir. Certainly, as defendants argue, Congress does know how to write clear conditions precedent. Hence, if Congress intended to establish a condition precedent to the creation of the drainage reservoir, it could have done so in a much more lucid manner.

Nevertheless, the court finds that the language in Section 7 does not unambiguously express an intent to abrogate Indian rights. First, some of the language in Section 7 appears to condition the use of the land upon purchase by the Secretary. For example, Congress "authorizes" the Secretary to purchase the land at a price agreed upon by the "Indian owners," but it does not unilaterally abrogate title or proclaim that the land would thereafter be used for drainage, as it could have done. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1902). Second, the section provides that the land "so acquired" shall be used as drainage; this language reasonably can be interpreted to mean that the land must be acquired before it can be used for drainage. Finally, Congress authorized the appropriation of money "to complete such purchases." Such language suggests that the band's rights were not abrogated until the purchase by the Secretary of Interior.

■ Having found that the language of the statute itself is ambiguous, pursuant to *Rosebud* and *Dion* the court looks to the dealings between the band and the government concerning the property at issue, and to the legislative history of the statute to determine whether there was a clear intent by Congress to abrogate Indian treaty rights.

As noted previously, the course of dealings between the band, the water districts and the government is very strong evidence that Congress intended in Section 7 to abrogate Indian rights and to provide compensation to the band for the previous flooding of its land due to irrigation. Defendants have clearly proven that the Boulder Canyon Dam Project was a high visibility project which had been ongoing since before the 1924 and 1928 withdrawals. Federal money was appropriated and spent to build the All American Canal and the Coachella Canal. The federal government was involved in designing, financing, and supervising the distribution and drainage systems in Coachella Valley. The sea level was visible and not hidden; thus, not only the band, but the government agents and Bureau of Indian Affairs agents could see the area inundated—it was not a latent or hidden condition. Moreover, a key component of the irrigation system established by the Boulder Canyon Dam Project was that drainage waters from Imperial Valley and Coachella Valley could be transported to the Salton Sea. In other words, using the Sea as a drainage reservoir was an integral part of the federal program to provide water to Southern California. Because drainage into the Salton Sea was critical to the success of the irrigation program, and because the legislative history indicates Congress knew that the Indian lands were in fact flooded, one could assume that Congress would not desire to have a multimillion dollar agricultural project spanning two counties halted until and unless $5,000 was paid to the band. *See* House Subcomm. on Indian Affairs of the House Comm. on Public Lands, Hearings on H.R. 4584, a Bill to Provide for Disposition of Lands on the Cabazon, Augustine, and Torres–Martinez Indian Reservations in California, and for Other Purposes, Vol. 1, p. 29 (May 23, 1949) (Reporter's Transcript, available at the National Archives) (hereinafter Hearings on H.R. 4584).

Finally, subsequent acts of the parties support the non-conditional construction urged by defendants. For example, in the decade following the 1950 Act, the Secretary of Interior and the Bureau of Indian Affairs approved several plans in the Coachella Valley for drainage systems which brought drainage waters from non-Indian fields across Indian land and deposited the water in the Sea. In sum, the Secretary of Interior did not act as if a condition precedent barred drainage into the Sea; in fact he actively participated in approving plans

and construction of drainage facilities by CVWD. *See* Exh. 1011.

Balanced against this persuasive evidence of dealings between the band, the water districts, and the government, however, is the legislative history. Some of the legislative history supports defendants' position; however, most, concededly by omissions from that history, supports plaintiffs' position.

Among the facts from the legislative history which supports defendants' position is the fact that in Section 7, at least, a concern for protecting drainage rights for the project took precedence over concern for Indian income. Congressman John Phillips, who introduced the bill, explained that it "establishes a definite boundary for the Salton Sea. That is for the land adjacent to the Salton Sea, which shall not be put up for private sale, which shall be kept as the land for the Salton Sea, to fill up from drainage." Hearings on H.R. 4584 at 5. The historical record reveals congressional concern that the land within the drainage reserve not have nuisance value, which it would if the Indians or non-Indian settlers could block a project which had been developed, financed, and supervised by the federal government since 1907.

The original version of the bill also supports defendants' position. That version, written by the Office of Indian Affairs, proposed that all non-irrigable Indian lands be appraised and sold by the Secretary to CVWD. H.R. 3056, 81st Cong., 1st Session 3 (1949). This original version supports a conclusion that the aim of Congress in Section 7 was to create the reserve, not to protect Indian rights. The fact that the United States elected to keep Indian land rather than sell it evolved out of expressed congressional concern about whether to sell the Indian land below the −220′ contour to CVWD or IID, Hearings on H.R. 4584 at 31, and from the United States Government's desire to keep some control over the project. Allocation of public funds to pay for the Indian land was required because the United States elected to keep the lands. Had the bill proceeded as originally written, CVWD would have paid the band for its lands and compensation would not have been an impediment to the project.

Supporting plaintiffs' position are the following points. First, even though the original version of the bill was aimed at establishing a perimeter for the Salton Sea at the −220′ contour, as the bill evolved, Congress added significant provisions to protect Indian interests. For example, the bill extinguished liens and provided for the construction of a drainage system on Indian lands, if the Indians consented, in order to increase the value of Indian lands and make them more amenable to agriculture. This sensitivity to Indian interests and desire to protect them is consistent with a reading that in the Act of August 25, 1950, Congress did not intend unconditionally to abrogate Indian rights in land below the −220′ contour.

Ultimately most persuasive is the fact that the court has been shown no legislative history which reflects that Congress clearly sought to extinguish unconditionally the band's rights to the land located below the −220′ contour regardless of whether or not the purchase was completed. No documents were presented which reflect that Congress appreciated that by holding title to inundated land, the band's ownership interest presented the nuisance threat to the Boulder Canyon Dam Project which Congress sought to prevent. In Section 7 it is clear that Congress provided authorization for the Secretary of Interior to purchase inundated Indian land: however, nowhere in the history presented does Congress or any participant in these proceedings appear to consider what would happen if the Secretary neglected to exercise his authority or if the band refused to sell its land.

In essence, the legislative history presented to the court indicates that the term "authorized" in Section 7 meant exactly that: that the Secretary of Interior was authorized to buy land from the band that was located below the −220′ perimeter. Because the face of the statute and the legislative history are ambiguous as to intent to abrogate Indian interests in land, I

hold the subsequent conduct of the defendants and the Executive's agents is insufficient to provide clear and convincing evidence of congressional an intent to abrogate Indian rights in the land. The fundamental problem that the court sees is relating the knowledge and appreciation of agents of the executive branch to Congress. Clearly by 1950, the executive branch, specifically the Secretary of Interior and agents of the Bureau of Indian Affairs, as well as the defendants, were aware of the band's interests in land located within the reservoir and appreciated their nuisance value. What is missing is any evidence that concern about the nuisance value of the Indian lands was communicated to Congress, or if it were, that this information influenced Congress so that the court could read in Section 7 an intent to abrogate Indian rights to the land below the −220′ contour regardless of whether the sale went through.

## VI. *Summary of Findings on Consent*

In sum, then, I find that defendants have failed to prove the two prongs for establishing consent by clear and convincing evidence. In 1924 and 1928 there is overwhelming evidence that the President intended to abrogate the rights of title to the land beneath the Salton Sea by creating the water reserve. There is, however, not clear and convincing evidence that the President knew that some of the land withdrawn was Indian land. In 1950, there is clear and convincing evidence that Congress knew the land beneath the −220′ contour belonged to Indians. However, there is not clear and convincing evidence that Congress intended to unconditionally abrogate those rights when it authorized the Secretary of Interior to purchase Indian lands. Even though the Boulder Canyon Dam Project was continuously a significant, visible federal project which was extensively supervised by the Secretary of Interior or his agents, the court does not find that the intent of the President in 1924 and 1928 legally can be imputed to Congress in 1950, or that the knowledge of Congress in 1950 is properly related back to the President in 1924 and 1928. In essence, the defendants have failed to prove consent to trespass on the Indian lands.

## VII. *Damages*

The parties agree that the proper measure of damages for trespass is the fair rental value of the property, assuming that the property is being put to its highest and best use. *Hammond v. County of Madera,* 859 F.2d 797, 804 (9th Cir.1988). The parties also agree that the highest and best use of the band's property involved in this lawsuit is agricultural. Indeed, it is virtually conceded that the plaintiffs' property has only nominal value unless it is used for agricultural purposes.

Plaintiffs seek present and future damages of $69,563,213.00. They claim that $30,313,059 is the historical lost income, for the years 1924–1992, excluding July 18, 1966 through September 29, 1976. Further, they allege that the cost of reclaiming their land is $32,617,730.00, and that the lost income during the ten-year reclamation period is $6,632,450. Finally, plaintiffs seek an injunction prohibiting defendants from continuing to flood their land. Defendants offer contrary testimony concerning the rental value of the property and vigorously oppose an injunction. I turn first to the issue of damages and will thereafter consider the issue of an injunction.

■■■■ All the Indian land involved in this lawsuit was classified as non-irrigable until 1950; hence, the rental value of the land from 1924–1950 is nominal since the lands were not fit for agriculture. All the experts agreed that in a situation where value is nominal, the court must arbitrarily select a figure which the court believes is fair. Plaintiffs proposed that the court award one dollar per acre for each year of inundation and compound the interest annually. By this procedure, the compensation for the trespass of worthless land becomes several million dollars. The court rejects this methodology as mathematical sophistry, or another example of "voodoo economics." A nominal damage figure is a recognition that a right of the plaintiffs should be respected, even though that right has no economic value. Providing interest

annually is inappropriate since there was no value to the land nor any reasonable expectation that the land would be rented. *See Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal.3d 86, 102, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979). Hence, the court awards $1000 per parcel for the trespass involved from 1924 through 1949. Since there are 39 parcels, the total award is $39,000.

■ Concerning damages from 1950–1992, the highest and best use of the land was agricultural. For land to have agricultural value, the soil must be capable of growing crops, there must be a sufficient water supply to irrigate the crops and to leech the soil, and it must be economical to farm the land. The court finds defendants' experts who testified concerning the quality of the Indian soil and the availability of water, particularly Mr. Hebler and Mr. Weeks, were more convincing than plaintiffs' experts, and the court relies extensively on them in making the following findings.

The court finds that the soil on the Indian land contains significant amounts of clay and is very salty. Certainly the salt content of the band's land has increased since 1924 due to the inundation by the Sea. However, the court finds that the inundated Indian lands have always had a high salt content; they were in the area where salt was mined and stored in the early 1900's. Further, stored salt was dispersed upon the inundated Indian lands by the flood. Additionally, the Colorado River water which flooded the land in 1905–07 was very salty; thus, had the irrigation drainage water not maintained the Sea at a high level, the 1905–07 flood water would have evaporated eventually,[5] a thick coat of salt upon the already salty soil.

As a result of the high concentration of salt, farming the irrigable Indian land would require significant leeching efforts. However, because the Indian land contains significant amounts of clay, leeching would be very difficult, since the clay causes wa-

ter to sit on the soil rather than drain through it. In sum, this land would be much more difficult to farm than other available land in the Coachella Valley that is not plagued by clay and high salt content.

Most important, however, is the fact that leeching and irrigating requires significant quantities of water, and the court is unconvinced by plaintiffs' experts' testimony that irrigation water has been available to the band since 1950. The Torres–Martinez land has been excluded from the Coachella Valley Water District since 1950 and, hence, it is not able to receive Colorado River water, but must rely on underground water supplies. The reason the Torres–Martinez land is not included within the CVWD is two-fold. From 1950–1954, the Indian land was excluded because the Bureau of Reclamation classified the land as non-irrigable. Legislation later in the 1950's gave the Torres–Martinez, Cabazon, and Augustine bands the election of having CVWD install drainage and distribution systems to provide irrigation to the land; however, the Torres–Martinez band elected not to take advantage of these benefits, and its opt-in period has expired. Thus, the band must rely upon underground water to irrigate its land.

The court finds that the testimony of the defense experts, and particularly Mr. Weeks, Mr. Lord, and Mr. Banks, is persuasive that the water supply in the upper aquifer is not plentiful and tends to be salty, making it unsuitable for agriculture. The court finds that water is plentiful in the lower aquifer, but the costs associated with installing wells capable of reaching water 1000' below the ground, and the costs of maintaining and using these wells are prohibitive.

Hence, in computing damages from 1950–92, the court relies extensively upon the testimony of Mr. Metcalf, as he used the facts developed by Mr. Hebler, Mr. Weeks, Mr. Lord, and Mr. Banks concerning the quality of the soil on the Indian

**5.** Interestingly, even though plaintiffs' experts dispute the high clay component of the soil, they agree that the sea would not have receded after the 1905–07 flood until 1923 because of the high clay composition of the seabed.

lands and the availability of water. Mr. Metcalf testified that the reasonable rental value of the affected Indian land from 1950–1992, excluding 1966–76, was $1,277,-062.00. The court awards to plaintiffs this amount.

■ Concerning the issue of future damages, the court must first resolve the issue of injunctive relief since it has a significant bearing on future damage calculations in this case. As noted previously, the plaintiffs seek an injunction and reclamation damages which total approximately $40,000,000. The defendants urge that an injunction is inequitable and impractical, and that the court must therefore award the fee value of the land as future damages. The defendants proffer testimony from Mr. Metcalf that the fee value of the land is $2,594,000.00.

■ There is some ambiguity as to whether plaintiffs seek an injunction or ejectment. In their complaint, plaintiffs seek an injunction. At trial, plaintiffs sought ejectment, and contended that ejectment was an automatic remedy for the tort of trespass. The court denies ejectment for three reasons. First, ejectment has historically been a discrete cause of action available to a plaintiff who cannot sue for trespass because he or she is not in possession of the land. *See* W. Page Keaton, et al., *Prosser and Keaton on the Law of Torts* § 13, at 77–78 (5th ed. 1984). In this case, plaintiffs alleged one cause of action, trespass, and have not pled, briefed, or proven the tort of ejectment. Second, the one case upon which plaintiffs rely, *Oneida Indian Nation of New York v. Oneida County*, 719 F.2d 525, 540 (2d Cir.1983) is inapposite. In *Oneida*, the Court analogized the Indian plaintiffs' claim to the common law action for ejectment; the court did not hold that ejectment was a remedy for trespass, particularly not the "automatic" remedy plaintiff urges.

Third, there is precedent for applying equitable factors and thereby limiting relief otherwise available for Indian claims. *See, e.g.*, *Brooks v. Nez Perce County*, 670 F.2d 835, 837 (9th Cir.1982) (laches may be weighed by district court in calculating damages where U.S. delayed over 54 years in bringing claim on behalf of Indian); *Oneida v. Oneida Indian Nation*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (dissenting justices state that laches should bar claim based on unlawful possession although majority expressed no view because the issue was not raised in the trial court).

■ For the reasons stated above, and because it is equitable to balance the hardships in this case since the rights of so many farmers would be significantly impacted by ejectment, the court holds that an equitable analysis is appropriate before issuing any final orders other than for monetary damages. Further, under the general common law, a party injured by a continuing trespass generally recovers damages and a permanent injunction requiring removal of the encroachment. 75 Am.Jur.2d *Trespass* § 113 at n. 78 (1991); *see also Baker v. Burbank–Glendale–Pasadena Airport Authority*, 39 Cal.3d 862, 218 Cal.Rptr. 293, 705 P.2d 866 (1985); 5 Witkin, *Summary of California Law* § 606 (9th ed. 1988). Therefore, the court will construe plaintiffs' request for ejectment as a request for a permanent injunction, and will analyze this request pursuant to the equitable factors suggested by the Restatement of Torts for determining the appropriateness of an injunction against trespass. These factors are the following:

(1) The nature of the interest to be protected;

(2) The relative adequacy of injunctive and other remedies available to the plaintiff;

(3) Any unreasonable delay of the plaintiff in initiating the action;

(4) Any related misconduct on the part of the plaintiff,

(5) The relative hardship of the parties if the injunction is granted or denied;

(6) The interests of third persons and the public;

(7) The practicability of framing and enforcing the injunction.

*Restatement (Second) of Torts* § 936(1)(a)–(g).

■ Applying the factors suggested by the Restatement, the court finds that injunctive relief is inappropriate in this case. The interest sought to be protected is land, something which the law regards as unique and which it usually protects with injunctive relief. However, this is not land to which the band has any historical tie. Most of this land has been inundated by the Salton Sea since it was withdrawn for the band's benefit. Moreover, plaintiffs unreasonably delayed some 54 years in bringing this lawsuit. There is no evidence of misconduct by the band, other than a lack of vigilance in protecting its rights, but there is misconduct on the part of the title holder, the United States. Indeed, a chief obstacle in analyzing this lawsuit is that the United States is a plaintiff and not a defendant.

The misconduct of the government is essentially categorized as omissions. For example, there is no reasonable explanation in the record for why the Secretary of Interior did not exercise the authority given to him in 1950 by the Act of August 25, 1950 to purchase the Indian land below the −220′ contour. Further, there is no reasonable explanation in the record why in 1924 and 1928 the President was not specifically alerted, in a documented manner, that the land he was withdrawing below the −220′ contour contained Indian land or why he did not refer to the statute authorizing withdrawal of Indian land for a water reserve.

The most glaring omission, however, is that the government did not protect these parties from their collision course resulting in this lawsuit. The Boulder Canyon Dam Project is an irrigation project in which the United States has been a key participant since President Roosevelt delivered a speech urging construction of it in 1907. United States employees organized, planned, and supervised construction and implementation of the project. United States taxpayers paid for the project. At least twice the United States was asked to sell the Indian lands involved to CVWD or IID and it elected not to, desiring to keep some control over the drainage basin. Since it was so involved with the project,

and since it elected to keep some control in the basin by retaining lands it was holding for the Indians as trustee, the United States government should have done a better job of protecting the Indians, IID, and CVWD. In essence, the band is suing these defendants largely because the United States inadequately protected the Indian property rights either by approving the sale of its land, buying its land, or prohibiting inundation of its land in the first place.

There is hardship to the plaintiff Indians if the injunction is not granted, since failure to enjoin the trespass will deprive them of their rights to use the land covered by the Sea. However, as against the interest of the 300 band members to their land, the court must balance the hardship to the agricultural industry in Imperial and Riverside counties if an injunction is granted. The agricultural industry in these counties is an enormous business which provides food to much of this country. An injunction would render useless thousands of acres of cultivated farmland to the detriment of innocent farmers who are blameless in this lawsuit and who have worked hard to cultivate desert lands.

■ For the reasons enumerated, the court declines to grant injunctive relief and will instead award monetary damages equal to the fee value of the property to compensate the band for all future damages based upon trespass. The court bases its computation of the fee value on Mr. Metcalf's testimony's for the reasons stated previously. Thus, the band is awarded $2,594,000 for all future damages.

■ The court holds that the defendants are severally liable. Multiple tortfeasors are jointly liable only where they contribute to an "indivisible injury." *American Motorcycle Assn. v. Superior Court*, 20 Cal.3d 578, 586, 146 Cal.Rptr. 182, 578 P.2d 899 (1978). Where it is possible to determine how much of the damage each defendant caused, each defendant is liable for only that amount. W. Page Keeton, et al., *Prosser and Keaton on the Law of Torts* 54 (5th ed. 1984); *see Restatement (Second) of Torts* § 433A. In this case, the

damages are capable of apportionment. The primary sources of water in the Salton Sea are from IID, CVWD, Mexican irrigation, and natural runoff from storms. There is testimony that IID is responsible for approximately 71.5% of the water in the Salton Sea. Hence, IID is ordered to pay that percent of the damages granted in this lawsuit. Further, there is testimony that CVWD is responsible for approximately 5.5% of the water in the Salton Sea. CVWD is ordered to pay that percent of the damages awarded.

 Finally, there is the issue of prejudgment interest. The court has previously ruled that there is no prejudgment interest on nominal damages. It also rules that there should be no prejudgment interest on past damages from 1950–1992.

 In a case arising under federal law, federal courts will look to state law in formulating a rule of decision, unless state law conflicts with the need for a uniform federal policy. *Bd. of Comm'rs. of Jackson County v. United States*, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *State Box Co. v. United States*, 321 F.2d 640 (9th Cir.1963). In *Jackson*, the Court, finding no well-established federal policy regarding liability for prejudgment interest, looked to state law in deciding whether the county was liable to an Indian band for prejudgment interest on wrongfully collected taxes. *Jackson*, 308 U.S. at 351, 60 S.Ct. at 288. The fact that the defendant was a political subdivision factored into the Court's decision to look to state law rather than apply the "general notions of equity" that govern liability for interest in a suit between the government and a private litigant for money owed the government. *Id.* at 349, 60 S.Ct. at 287. In this case, the defendant districts are akin to the county in *Jackson* and, thus, this court will look to state law in determining liability for prejudgment interest.

 Because the damages in this case are disputed, California Civil Code § 3288 applies. This section provides that interest may be given in an action "for the breach of an obligation not arising from contact ... in the discretion of the [trier of fact]."

Cal.Civ.Code § 3288 (West 1970). This section "permits discretionary prejudgment interest for unliquidated tort claims." *Greater Westchester Homeowners Ass'n v. City of Los Angeles*, 26 Cal.3d 86, 102, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979). The award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss. *Id.* at 102–03, 160 Cal.Rptr. 733, 603 P.2d 1329.

 The court declines to award prejudgment interest because it is very speculative that the Indian land in this lawsuit would have resulted in an "accretion of wealth." There is no evidence that anyone has ever sought to rent or buy the Indian land involved in this lawsuit and, as noted, the land is not desirable because of the extensive clay and salt content of the soil, and because the band has no ready access to an inexpensive supply of water. Moreover, in this case, awarding prejudgment interest seems inequitable since it would in effect reward the plaintiffs for not being vigilant about bringing this lawsuit much earlier than they did.

### Conclusion

In conclusion, the court finds defendants are liable for trespass for the years 1924–1992. Plaintiffs are awarded nominal damages of $39,000, and past damages of $1,277,062.00. The court denies injunctive relief because it is inequitable and impractical. Instead, it awards future damages of $2,594,000.00 which sum reflects the fee value of the land. Plaintiffs are awarded costs of suit. Plaintiffs' counsel are directed to prepare and file a judgment which corresponds to this decision by August 1, 1992.